UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA MROZINSKI, | ) | CASE NO. 1:16CV664 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | |
| ACTING COMMISSIONER OF | ) | REPORT AND RECOMMENDATION |
| SOCIAL SECURITY, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Sandra Mrozinski ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security ("Defendant") denying her application for disability insurance benefits ("DIB").  In her brief on the merits, filed on August 9, 2016, Plaintiff asserts that the administrative law judge ("ALJ") erred because: (1) the finding that Plaintiff had skills transferable to a significant number of jobs in the economy lacked the support of substantial evidence; and (2) the ALJ failed to comply with the treating physician rule when evaluating the opinion of Plaintiff's treating specialist.  ECF Dkt. #11 at 3.  On September 22, 2016, Defendant filed a response brief. ECF Dkt. #12.  Plaintiff filed a reply brief on October 20, 2016.  ECF Dkt. #14.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

## I.    FACTUAL AND PROCEDURAL HISTORY

On June 30, 2011, Plaintiff filed an application for DIB, alleging disability beginning December 19, 2009.  ECF Dkt. #9 ("Tr.") at 17.[2]  Plaintiff's claim was denied initially and upon

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than the page numbers assigned when the Transcript was compiled.  This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

reconsideration.  *Id.* at 176, 188.  Plaintiff then requested a hearing, which was held on January 9, 2013, during which Plaintiff and a vocational expert ("VE") testified.  *Id.* at 77-121.  On March 11, 2013, the ALJ issued a decision denying Plaintiff's DIB claim.  *Id.* at 150.  Subsequently, the Appeals Council vacated the ALJ's decision and remanded Plaintiff's case for further evaluation.  *Id.* at 168.  On April 1, 2015, the ALJ held a new hearing and heard testimony from Plaintiff and a different VE.  Tr. at 39-74.  The ALJ issued a decision again denying Plaintiff's DIB claim on May 5, 2015.  *Id.* at 14.  On January 22, 2016, the Appeals Council denied Plaintiff's request for review of the ALJ's decision issued on May 5, 2015.  *Id.* at 7.  Accordingly, the May 5, 2015, decision issued by the ALJ stands as the final decision.

Plaintiff filed the instant suit seeking review of the ALJ's May 5, 2015, decision on March 17, 2016.  ECF Dkt. #1.  On August 9, 2016, Plaintiff filed a brief on the merits.  ECF Dkt. #11.  Defendant filed a response brief on September 22, 2016.  ECF Dkt. #12.  Plaintiff filed a reply brief on October 20, 2016.  ECF Dkt. #14.

## II.     RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.     Medical Evidence

In or around 2007, Plaintiff began receiving care from Dr. Samuel W. Samuel, M.D.  Tr. at 557.  When she visited Dr. Samuel on November 13, 2007, Plaintiff complained of pain in her left leg.  *Id.* at 556.  Dr. Samuel noted that Plaintiff was status post left L4-L5, L5-S1 transforaminal epidural steroid injection with excellent relief of her pain, and ordered Plaintiff to return in three weeks for a second round of injections.  *Id.* at 556-57.

On December 19, 2009, Plaintiff was involved in a motor vehicle accident.  Tr. at 492.  Following the accident, Plaintiff was seen in the emergency department at Parma Community General Hospital, where she complained of pain in her neck and lower back.  *Id.*  Plaintiff also reported a history of underlying lower back pain due to spinal stenosis, and denied mid-back pain, extremity pain, numbness, vomiting, diarrhea, chest pain, palpitations, and difficulty breathing.  *Id.*  On examination, Plaintiff was awake and alert, her head and face were atraumatic, she was oriented, and she displayed good and equal strength, sensation, reflexes, and cerebellar function bilaterally.  *Id.* at 492-93.  Plaintiff also displayed mild general discomfort to palpation over the lumbar spine

-2-

without localization, her dorsal spine was minimally tender without localization, and most of her tenderness was on palpation over the left and right paracervical musculature. *Id.* at 493. Additionally, Plaintiff's shoulders, thorax, hips, pelvis, and all four extremities were non-tender with good distal neurovascular function. *Id.* X-rays of Plaintiff's cervical and lumbar spine showed extensive degenerative disc disease without acute fracture. *Id.* at 493, 497-500. Plaintiff had Ultram at her home, which she stated worked fairly well for the pain, and she was prescribed ibuprofen and Robaxin for the next three days and was advised to follow up with her primary care physician if her pain did not improve.[3] *Id.* at 493.

Plaintiff saw Dr. Samuel on January 5, 2010, for a follow up on her lower back pain and pain on the left side of the neck. Tr. at 743. On examination, Plaintiff displayed: alertness and orientation; no enema or erythema; mild tenderness in the left posterior scapular region, mild tenderness in the left side of the lower back, and otherwise no additional points of tenderness; and fully intact gait, motor, and sensory function. *Id.* at 743-44. Dr. Samuel continued Plaintiff's Ultram, Robaxin, and ibuprofen prescriptions. *Id.* at 744.

On January 28, 2010, Plaintiff saw Renattie Martin, CNP, and complained of pain in her lower back and left leg. Tr. at 563. Plaintiff rated her pain as 11/10, indicating that Ultram was no longer effectively controlling her pain and that she had begun taking up to eight tabs of Vicodin daily, in addition to Motrin and her dose of Robaxin.[4] *Id.* Nurse Martin stated that Plaintiff was tolerating the pain medications well and denied fatigue, weakness, dizziness, lightheadedness, rashes, abdominal discomfort, dyspnea, palpitations, chest discomfort, or motor or sensory abnormalities. *Id.* In response to Plaintiff's complaints, Nurse Martin ordered trigger point injections in Plaintiff's lumbar paraspinal muscles. *Id.* at 564. Additionally, Nurse Martin informed

---

[3]Robaxin is a muscle relaxant. Robaxin, https://www.drugs.com/robaxin.html (last visited January 18, 2017).

[4]Vicodin is used for the relief of moderate to moderately severe pain. Vicodin, https://www.drugs.com/vicodin.html (last visited January 18, 2017); Motrin is a non-steroidal anti-inflammatory drug used to reduce fever and treat pain or inflammation caused by many conditions such as headache, toothache, back pain, arthritis, menstrual cramps, or minor injury. Motrin, https://www.drugs.com/motrin.html (last visited January 18, 2017).

Plaintiff that she was overusing Vicodin, and explained the risks of liver impairment associated with the overuse of Tylenol. *Id.*

On February 4, 2010, Plaintiff underwent an MRI of her lumbar spine, revealing a thirty percent acute or subacute compression fracture of the L1 vertebral body, with no abnormal epidural or paravertebral soft tissue and no significant dorsal displacement in the posterior wall. Tr. at 506. It was noted that the MRI results most likely represented a benign osteopathic compression fracture. *Id.* The MRI also showed moderate-severe spondylotic changes in the mid and lower lumbar spine. *Id.* Dr. Samuel administered a L3-L4 epidural steroid injection with fluoroscopic guidance. *Id.* at 509. On February 15, 2010, Dr. Samuel performed a kyphoplasty. *Id.* at 570, 575. Following the kyphoplasty, Dr. Samuel noted that there were instruments and cement associated with the vertebral augmentation procedure at a single level, and that there was some volume loss of the vertebral body and a small portion of cement extending to the adjacent disk space. *Id.* at 575. Plaintiff also had lumbar epidural steroid injections on February 22, 2010, and March 15, 2010. *Id.* at 576, 746. Also on March 15, 2010, Plaintiff reported that the pain in her left leg had completely resolved. *Id.* at 579.

From September 2010 to November 2010, Plaintiff underwent a physical therapy regime involving the strengthening of her core muscles, muscle energy techniques, and pain relief. Tr. at 595. On November 17, 2010, it was noted that Plaintiff achieved most of her physical therapy goals and it was recommended that Plaintiff continue her physical therapy at home. *Id.* During her time in physical therapy, Plaintiff's reports indicate that she was feeling better as physical therapy progressed. *Id.* at 596-611. On the day Plaintiff was discharged from physical therapy she reported her pain as 1/10 and stated that she "felt good today." *Id.* at 596. On October 12, 2010, Plaintiff told Dr. Samuel that her only concern was that she had a cold for the two previous weeks and that she had "lost some of her voice." *Id.* at 647.

Plaintiff visited Dr. Samuel on December 9, 2010. Tr. at 751. Dr. Samuel indicated that Plaintiff was "actually doing very well," that she was only complaining of her regular lower back pain, and that Plaintiff had no pain (presumably other than her regular lower back pain). *Id.* At this visit, Plaintiff denied any pain in her legs, and Dr. Samuel noted that Plaintiff was doing very well

on her medications.  *Id.*  Plaintiff denied any weakness, and it was noted that she had no balance problems.  *Id.*  On examination, Plaintiff showed good motor power in knee flexion/extension and dorisflexion/plantarflextion, and internal and external rotation of both hips was unremarkable.  *Id.* at 752.  Plaintiff had mild bilateral lumbar tenderness with mild sacroiliac tenderness, however, she showed negative facet loading.  *Id.*  Following the examination, Dr. Samuel determined that Plaintiff was very stable with her medication plan, and experienced minimal pain.  *Id.*  On December 15, 2010, Plaintiff reported that she was feeling stressed because she could not find work.  *Id.* at 644.

On July 25, 2011, Plaintiff visited Michael Louis Raddock, M.D., complaining of back pain and a rash.  Tr. at 636.  Plaintiff told Dr. Raddock that she wanted to qualify for Social Security benefits because her "back really bother[ed] her," pain shot down her legs, and sometimes she could not sit up or stand.  *Id.*  Plaintiff reported that: she typically received injections around Christmas every year; Ultram worked for her pain; therapy following the 2009 car accident helped relieve pain in her leg; and exercise helped.  *Id.*  Dr. Raddock referred Plaintiff for physical therapy and pain management.  *Id.*

On August 2, 2011, Plaintiff visited Allied Health complaining of increased back pain.  Tr. at 632-34.  Plaintiff indicated a pain level of 4/10 that could increase to 9/10 with housework.  *Id.* at 633.  Based on a questionnaire completed by Plaintiff, it was determined that Plaintiff would benefit from lower extremity stretches and strengthening, as well as a transcutaneous electrical nerve stimulation ("TENS") unit for her home.  *Id.* at 634.  Plaintiff returned to Allied Health on August 8, 2011, and was issued a TENS unit and instructed in its use.  *Id.* at 630.  Later in August 2011, Plaintiff reported her pain as 2/10, stating that she used the TENS unit twice a day and that it helped relieve her back pain.  *Id.* at 671.  Plaintiff also reported that she did not need as much pain medication as the result of the use of the TENS unit.  *Id.*  On August 29, 2011, Plaintiff indicated that she could not pay for the gas required to attend her physical therapy appointments and discontinued therapy at Allied Health.  *Id.* at 676-77.

On October 5, 2011, Plaintiff visited Kutaiba Tabbaa, M.D.  Tr. at 704.  Dr. Tabbaa indicated that Plaintiff was positive for depression, and could stand for ten minutes and sit for twenty minutes. *Id.*  It was noted by Dr. Tabbaa that Plaintiff's pain level was "3 and 2," and that Plaintiff did not

have problems sleeping. *Id.* On examination, Plaintiff's lumbar flexion was mildly painful, lumbar extension was extremely painful, and lumbar rotation was moderately painful. *Id.* at 705, 735. Plaintiff's reflexes were 2+ in the bilateral upper and lower extremities, and rotation was moderately painful. *Id.* at 735. A sensory examination revealed normal sensation in all of Plaintiff's dermatomal regions of all extremities, normal motor strength in all myotomal regions of all extremities, and normal fine motor coordination and gait. *Id.* Dr. Tabbaa ordered pool therapy, smoking cessation, weight control, and left L4-L5 and L5-S1 facet injections. *Id.* X-rays of Plaintiff's lumbar spine were taken on October 19, 2011. *Id.* at 737. Dr. Raddock reviewed the x-rays and indicated that the x-rays showed a fracture of the L1 vertebra that demonstrated: changes consistent with vertebroplasty; severe degenerative changes throughout the lumbar and visualized distal thoracic spine; generalized osteopenia; and mild bilateral sacroilitis. *Id.* On November 30, 2011, Plaintiff received another spinal steroid injection. *Id.* at 724.

On January 13, 2012, Dr. Tabbaa discussed exercises, medication, interventional therapies, and surgery with Plaintiff. Tr. at 717. Dr. Tabbaa told Plaintiff that a healthy life style coupled with patient hard work was essential to achieve wellness, and refilled Plaintiff's prescriptions. *Id.* On April 19, 2012, Plaintiff visited the Cleveland Clinic Pain Management Department for a follow up regarding her lower back pain, reporting that her pain had worsened over the last six days and rating the pain at 10/10. *Id.* at 781. On examination, Plaintiff displayed: normal upper and lower extremity strength; no atrophy or tone abnormalities; a negative straight leg raise test; positive facet loading; antalgic gait; intact bilateral upper and lower extremity coordination; physiologic and symmetric muscle stretch reflexes; and decreased sensation in the left toes. *Id.* at 781-82. As the result of the examination, a series of lumbar epidural blocks was started that day, and a medrol dose pack and physical therapy were ordered. *Id.* at 782. Plaintiff received the second lumbar epidural injection in the series on May 30, 2012. *Id.* at 804.

On June 27, 2012, Plaintiff began another round of physical therapy. Tr. at 756. At this time, Plaintiff reported that: her pain medication provided little relief; she could care for herself, but it increased her pain; she could lift only very light weights; her pain prevented her from sitting more than thirty minutes, and standing more than ten minutes; she slept less than six hours, even when

-6-

taking her pain medication; she had "hardly any" social life due to her pain; her pain restricted travel over one hour; and her pain restricted her to light employment/housemaking duties. *Id.* at 756-57. Plaintiff indicated that her social activity consisted of going to the pool with her granddaughter. *Id.* at 757.  Based on these assertions, Plaintiff was instructed to follow up for one visit per week for four weeks for therapeutic exercise, body mechanics, manual therapy, home exercise therapy, and additional therapy "as needed" by Plaintiff (Modalities PRN). *Id.*

Plaintiff received the third epidural steroid injection in the aforementioned injection series on July 9, 2012. Tr. at 763, 785-86.  On September 9, 2012, Dr. Samuel diagnosed lumbar canal stenosis and lumbar degenerative disc disease, and performed a L4-L5 lumbar epidural steroid injection. *Id.* at 845.  On September 15, 2012, Plaintiff was admitted to the hospital for facial numbness, impaired speech, and right arm weakness. *Id.* at 853.  Kourosh Saghafi, D.O., attributed Plaintiff's symptoms to anxiety as she was hyperventilating and experiencing anxiety at the time these symptoms occurred. *Id.* at 871.  An MRI of Plaintiff's brain revealed no acute intracranial process and minimal nonspecific white matter changes. *Id.* at 889.  Computerized tomography ("CT") scans were also taken of Plaintiff's brain, neck, and arteriogram. *Id.* at 890-91.  The CT scans revealed: a normal brain with no evidence of intracranial process; no significant stenosis in either carotid bifurcation, patent cervical vertebral arteries, and suspicion of mild fibromuscular dysplasia in the disial right vertebral artery; and long segment mild narrowing of the mid basilar trunk, but otherwise no evidence of significant large vessel intracranial occlusive disease. *Id.* at 892.

On October 4, 2012, Plaintiff saw a physician's assistant, Dalbir Singh, for a follow up appointment for pain in her lower back on the left side that radiated into her left leg. Tr. at 931.  On examination, Plaintiff appeared well and in no acute distress, and displayed: normal bilateral upper and lower extremity strength; no atrophy or tone abnormalities; negative straight leg raise tests; negative pain to palpation in the lumbar paraspinal muscles; positive bilateral facet loading; good capillary refill; antalgic gait; intact coordination in the bilateral upper and lower extremities; physiologic and symmetric muscle stretch reflexes; and no loss of sensation. *Id.* at 932.  Based on

Plaintiff's examination by PA Singh, Dr. Samuel prescribed Mobic and an epidural injection, and ordered Plaintiff to undergo an MRI.[5]  *Id.*

Per Dr. Samuel's order, an MRI was performed on October 10, 2012.  Tr. at 954.  The MRI revealed interval kyphoplasty/vertebroplasty at the L1 vertebral body and otherwise stable moderate-severe degenerative disc disease at the lumber spine.  *Id.*  Plaintiff received the epidural injection ordered by Dr. Samuel on October 18, 2012. *Id.* at 950.  Plaintiff underwent physiologic arterial testing in her bilateral legs on December 6, 2012, which suggested possible bilateral stenoses.  *Id.* at 957-58.

Plaintiff visited John Patzakis, D.O., on December 12, 2012, for evaluation of discoloration of her right lower extremity.  Tr. at 915.  Dr. Patzakis diagnosed carotid artery stenosis, peripheral arterial disease, lumbosacral disc disease, and chronic obstructive pulmonary disease, secondary to smoking history.  *Id.* at 916.  Additionally, Dr. Patzakis discussed smoking and atherosclerotic vascular disease with Plaintiff at length, and told her that the most important issue was her smoking cessation.  *Id.*

On March 20, 2013, Dr. Samuel performed a right-sided C4, C5, and C6 facet median branch block "with excellent relief of [Plaintiff's] right-sided pain.  Tr. at 1020.  Plaintiff followed up with PA Singh on June 18, 2013, reporting that the left transforaminal injection performed in October 2012 provided "good relief."  *Id.* at 1026.  PA Singh planned another epidural injection, conditioned on Dr. Samuel's approval, and continued Plaintiff's Tramadol prescription.[6]  *Id.*  Plaintiff received additional epidural injections on July 8, 2013, July 29, 2013, September 9, 2013, and December 23, 2013.  *Id.* at 970, 983, 1030, 1033, 1045, 1057.  Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2013.  *Id.* at 20.

---

[5]Mobic is a nonsteroidal anti-inflammatory drug.  Mobic, https://www.drugs.com/mobic.html (last visited January 18, 2017).

[6]Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain.  Tramadol, https://www.drugs.com/mobic.html (last visited January 18, 2017).

**B.**      **Opinion Evidence**

Plaintiff presents the opinion evidence from each source in turn.  ECF Dkt. #11 at 7-10.  As such, the undersigned has followed the same format herein.

**1.**      **Samuel W. Samuel, M.D.: Treating Physician**

On October 4, 2012, Dr. Samuel completed a General Medical Source Statement.  Tr. at 910.  Dr. Samuel listed Plaintiff's diagnoses as "spinal stenosis lumbar region," and indicated that Plaintiff's prognosis was "good."  *Id.*  According to Dr. Samuel, Plaintiff's symptoms included radicular pain, depression, and back pain.  *Id.*  Dr. Samuel also indicated that Plaintiff experienced pain in her right leg, and that changing weather, stress, and/or repetitive motion precipitate or worsen that pain.  *Id.* at 911.  When asked how often during a typical workday would Plaintiff's pain be severe enough to interfere with attention and/or concentration needed to perform even simple work tasks, Dr. Samuel marked "[f]requently."  *Id.*  Dr. Samuel indicated that Plaintiff's medications may cause side effects that have implications for working, namely, dizziness and drowsiness.  *Id.*  Continuing, Dr. Samuel opined that Plaintiff could: stand or walk for thirty minutes at a time for a total of four hours in an eight-hour workday; and sit for up to two hours at a time for a total of six hours in an eight-hour workday.  *Id.* at 912.  Dr. Samuel indicated that Plaintiff required a job that had an at-will sit/stand option, and that she did not require a cane and did not need to take unscheduled breaks during an eight-hour workday.  *Id.*

Next, Dr. Samuel opined that Plaintiff could: frequently lift less than ten pounds; occasionally lift ten pounds; rarely lift twenty pounds; never lift fifty pounds; frequently climb stairs; occasionally twist; rarely stoop or crouch/squat; never bend; and frequently look down, turn her head right or left, look up, and hold her head in a static position.  Tr. at 913.  Dr. Samuel indicated that Plaintiff's impairments were likely to produce "good days" and "bad days," and that Plaintiff would miss "[a]bout three days per month" on average.

The ALJ afforded Dr. Samuel's opinion some weight to the extent that the record showed a history of back pain with reduced range of motion and impaired gait. Tr. at 28. The ALJ added that Dr. Samuel's overall opinion was unsupported by the record as a whole.[7]

### 2.     Karin Kleppel: Physical Therapist

On December 27, 2012, Karin Kleppel, a physical therapist at the Cleveland Clinic, performed a Functional Capacity Evaluation for Plaintiff. Tr. at 918. Ms. Kleppel rated Plaintiff's self-perception of disability at extremely high, and indicated that Plaintiff displayed a severe level of depression and anxiety. *Id.* Plaintiff's physical strengths included: normal cervical range of motion; normal range of motion in all extremities (except for her shoulders); and normal grip and pinch strength. *Id.* According to Ms. Kleppel, Plaintiff's weaknesses included: decreased range of motion of the lumbar spine; decreased strength of the core and trunk muscles; decreased balance and unilateral stance; decreased flexibility of the left lower extremity; and questionable cardiovascular endurance. *Id.* at 919. As a result, Plaintiff tested at the sedentary/light physical demand level. *Id.* Ms. Kleppel found that the reliability of Plaintiff's reports was fair, as was Plaintiff's effort during the evaluation. *Id.* Continuing, Ms. Kleppel indicated that Plaintiff "rated her perceived capacity inferior for her normative group which may be that she is actually much less functionally competent or may be over-limiting her participation in activities." *Id.* at 923. Ms. Kleppel noted that Plaintiff ambulated with a very narrow base of support with frequent scissoring of her right foot across her left foot, and that she tended to keep her trunk flexed slightly forward with normal arm swings. *Id.* at 924. As a result of the observations made during the evaluation, Ms. Kleppel recommended that Plaintiff: resume doing all exercises that she learned in physical therapy on a daily basis; start

---

[7]Plaintiff also provides medical evidence that she believes supports Dr. Samuel's opinion in this section of her brief. The discussion of whether Dr. Samuel's opinion is supported by substantial evidence is more appropriate in the Law and Analysis section of this Report and Recommendation; Plaintiff also includes a section addressing Dr. Patzakis' diagnosis of peripheral artery disease and advice that Plaintiff quit smoking. ECF Dkt. #11 at 8. Even if Dr. Patzakis' diagnosis and advice could be construed as opinion evidence, the ALJ did not assess the evaluation or test results, and neither party asserts that Dr. Patzakis' diagnosis or advice has any impact on the legal issues presented in this case. As such, Dr. Patzakis' diagnosis and advice will not be addressed in this section of the Report and Recommendation.

exercising in an aquatic setting to allow better tolerance of pain; and to use her TENS unit on a daily basis, as Plaintiff had only been using the unit twice a month. *Id.* at 920.

The ALJ afforded full weight to Ms. Kleppel's assessments, indicating that the assessments were consistent with her observations as well as Plaintiff's demeanor during office visits, in which medical professionals described Plaintiff as "well appearing" and "in no distress" despite her alleged 10/10 pain complaints. Tr. at 26.

### 3.    Regina Socha: Witness

Regina Socha provided a witness statement dated July 23, 2012. Tr. at 430-32. Ms. Socha described her relationship with Plaintiff, stating, "[t]hough not legally, I am considered her daughter-in-law." *Id.* at 430. At the time Ms. Socha wrote the witness statement, she was living with Plaintiff due to a fire in her home. Ms. Socha stated that Plaintiff could not move like she had in the past and was moving very slowly in the mornings. *Id.* Continuing, Ms. Socha indicated that Plaintiff could not stand for long periods of time, and that Plaintiff experienced shooting pains in her leg that required her to lay down on the bed until the pain passed. *Id.* at 430-31. According to Ms. Socha, Plaintiff cried during the shooting pains in her leg because of how badly they hurt. *Id.* at 431. Ms. Socha also stated that she had observed Plaintiff become very depressed due to the pain, and has witnessed Plaintiff experience memory problems. *Id.*

The ALJ afforded little weight to the opinion of Ms. Socha for the following reasons: by virtue of the relationship as a friend of Plaintiff's, Ms. Socha cannot be considered a disinterested third-party witness and instead would have a natural tendency to agree with the statements and limitations alleged by Plaintiff; and, more significantly, Ms. Socha's statements, like those of Plaintiff, are unsupported by the relatively normal mental and physical findings present in this case. Tr. at 28.

### 4.    Herschel Pickholtz, Ed.D.: Psychologist

On September 16, 2011, Herschel Pickholtz, Ed.D., performed a consultative psychological examination of Plaintiff. Tr. at 662. During the examination, Plaintiff was asked what was stopping her from working. *Id.* at 663. Plaintiff replied that she was looking for a job and that she had been laid off three years prior to the examination. *Id.* Plaintiff stated that she had back problems, and did

-11-

not report experiencing psychiatric or mental health symptoms in the past involving depression, anxiety, or psychotic features.  *Id.* at 663.  Continuing, Plaintiff indicated that she: took care of her hygiene and changed her clothing everyday; shampooed her hair three times per week; vacuumed and swept the floors once per week; mopped once a month; did the laundry once a week; shopped for food once a month; cooked dinner four times per week; did not have email; did not use a cell phone often; operated the television each day; did not play video games, board games, or cards; read the newspaper; took her grandchildren to school; checked homework and paperwork; babysat her grandchildren once a month and enjoyed reading to them; socialized with relatives three times a month; socialized with associates twice a month; rarely attended religious services; cooked out on Friday nights; and spent time with her children and grandchildren on weekends.  *Id.* at 667.  Dr. Pickholtz opined that Plaintiff was not impaired in any area related to her ability to function at work, and assigned Plaintiff a global assessment of functioning score of seventy-five.  *Id.* at 668-69.

### 5. Steve E. McKee, M.D., and Michael Lehv, M.D.: Reviewing Physicians

Steve E. McKee, M.D., evaluated the evidence in Plaintiff's file as of September 12, 2011. Tr. at 126-35.  Dr. McKee opined that Plaintiff could: stand and/or walk, with normal breaks, for about six hours in an eight-hour workday; sit, with normal breaks, for about six hours in an eight-hour workday; lift twenty pounds occasionally; and lift ten pounds frequently.  *Id.* at 126-35. Michael Lehv affirmed the opinion rendered by Dr. McKee based on medical evidence in Plaintiff's file as of March 3, 2012.  *Id.* at 136-49.  The ALJ afforded great weight to the opinions of the state agency reviewing physicians, stating that the opinions were well supported by treatment notes.  *Id.* at 27.

### C. Testimonial Evidence

The ALJ held a hearing on April 1, 2015.  Tr. at 39.  Plaintiff, her counsel, and a VE appeared for the hearing.  *Id.*  Following an opening statement from the ALJ, Plaintiff was examined by the ALJ.  *Id.* at 43.  Plaintiff testified that she had last worked in 2008, and that she earned a GED in 2010 while she was unemployed.  *Id.*  Continuing, Plaintiff stated that she was in a motor vehicle accident in 2009, resulting in surgery to repair a fractured spine.  *Id.* at 44-45.  Plaintiff indicated

that the surgery was fairly successful, however, she still had "all [her] other pain," including pain running down her left leg resulting in a limp. *Id.* at 45.

       The ALJ then inquired about Plaintiff's prior work. Tr. at 46.  Plaintiff testified that she had been required to lift boxes weighing up to forty to fifty pounds weekly. *Id.*  Continuing, Plaintiff stated that her job title was originally "office manager" and that she "took care of the whole office for fifteen years." *Id.*  Plaintiff indicated that her duties included: invoicing on a computer, without the internet, described as a "green machine"; helping customers pay their bills; invoicing after services were provided; accepting payments; filing; and doing "[w]hatever needed to be done. *Id.* at 46-47.  Next, Plaintiff testified that she had the authority to hire and fire employees "only in her office," and that she had hired temporary employees when she was out of the office for medical reasons or when there was enough work to necessitate another employee. *Id.* at 47.

       Next, Plaintiff was examined by her attorney. Tr. at 48.  Plaintiff stated that she had worked on "really old computers," and had not learned current word processing. *Id.*  Continuing, Plaintiff indicated that she did not use a computer to take inventory, and that everything was done with paper and pencil. *Id.*  The attorney continued questioning Plaintiff as to her prior job duties, and Plaintiff responded that she: was not able to take dictation; did not prepare correspondence for her boss; did not perform any typing; and resolved disputes with customers. *Id.* at 48-49.  Plaintiff testified that she worked from a desk and that she was required to get up and move constantly, never sitting down for more than thirty minutes at a time. *Id.* at 49.  The attorney then asked Plaintiff what parts of her prior job would she be unable to perform, and Plaintiff indicated that she: could not sit very long because of the pain in her leg; could "hardly" stand for a minute; must "lean up against something"; and must try to sit down (presumably Plaintiff meant she must sit down after standing for one minute). *Id.*

       Plaintiff testified that she was able to take a gallon of milk from the fridge and "put it down real fast on the counter," but that she was unable to carry the gallon of milk beyond that quick action. Tr. 50.  Continuing, Plaintiff stated that she could carry a two-liter jug of soda, but she had to carry it in the center of her body and use two hands. *Id.*  Plaintiff indicated that when she was at home she spent most of her time in her bed laying on her right side due to the pain in her left side,

-13-

and that while laying in bed she would stretch out her left leg in an effort to relieve the pain. *Id.* at 50-51. Next, Plaintiff testified that when sitting in a chair she had to shift her weight to her right side and stretch her left leg out to the rear. *Id.* at 51. Plaintiff stated that her pain was only gone when she was laying down, and that as her pain became more intense it impacted her attention and concentration. *Id.* As an example, Plaintiff indicated that attention and concentration problems resulting from her pain caused her to be unable to help her granddaughter with her math homework. *Id.* at 51-52.

Plaintiff testified that she received injections every year, and that she could typically handle living with the pain with her medications. Tr. at 52. Continuing, Plaintiff stated that there were times when the pain suddenly became so bad in her lower back and left leg that she could not move. *Id.* Plaintiff indicated that when her pain became so intense as to prohibit movement, she would call Dr. Samuel, who would provide additional injections. *Id.* When asked about the injections Plaintiff explained that she typically received a series of three injections over the course of a couple of months, but the third injection did not typically relieve any additional pain. *Id.* at 52-53. Plaintiff testified that she had reached the limit for the number of injections she could receive, and that Dr. Samuel was now recommending that she visit a neurosurgeon. *Id.* at 53.

Next, Plaintiff was asked what activities, in addition to turning and moving quickly, increased her pain. Tr. at 53. Plaintiff stated that her pain increased when she bent over to brush her teeth, and that in the morning she would return to bed after brushing her teeth, eating her cereal, and taking her medication. *Id.* at 53-54. Continuing, Plaintiff testified that she did not bend down to pick up objects that were dropped on the floor, and that she was unable to lift the quilts to make her bed, instead throwing one blanket over the bed. *Id.* at 54. Plaintiff indicated that she gave up cooking once she moved into her son's home in July 2012 when she lost her house, and that she could have still performed some cooking at that time, such as preparing Ramen noodles. *Id.* at 54-55.

Plaintiff's attorney then asked about the condition of Plaintiff's neck, to which Plaintiff indicated that her neck was sore after the car accident in 2009, so Dr. Samuel provided an injection to help ease the pain. Tr. at 55. Continuing, Plaintiff stated that, despite the injection, she could not

-14-

keep her head down for a long period of time to do paperwork or read. *Id.* Plaintiff also described a single episode during which she experienced numbness in her face and arms, and began having problems speaking properly. *Id.* at 55-56. According to Plaintiff, during this event a friend noticed the speech problems and stated that "it sounded like [Plaintiff] was having a stroke." *Id.* at 56. Plaintiff stated that she was taken to the hospital, where she was diagnosed with what she refers to as "TIA, a mini stroke." *Id.* Continuing, Plaintiff testified that she was told by hospital staff to take a baby aspirin every day. *Id.* at 56-57. When asked whether hospital staff had also told her to stop smoking, Plaintiff indicated that she was told to stop smoking and that she had quit smoking nearly two years prior to the hearing. *Id.* at 57. Additionally, Plaintiff stated that the second reason she had quit smoking was a blockage in her right leg, which caused her foot to occasionally turn blue. *Id.*

When asked whether she still "[went] places with her girlfriends," Plaintiff stated that she did not go anywhere except food banks and that she stopped spending time with her friends after the car accident in 2009. Tr. at 57. It was noted by Plaintiff's attorney that Plaintiff had just testified that she was at a friend's house when she had the "mini stroke," and Plaintiff stated that she was only at her friend's house because her friend needed a ride downtown. *Id.* at 57-58. When asked whether she still drove, Plaintiff responded, "hardly ever." *Id.* at 58.

Plaintiff testified that she had been undergoing treatment for depression, including the prescription of Cymbalta, which had helped improve her depression. Tr. at 58-59. Continuing, Plaintiff stated that Dr. Samuel attributed the pain in her leg to: lumbar stenosis; degenerative disc disease; arthritis; ciatica; calcium deficiency; and osteoporosis. *Id.* Further, Plaintiff indicated that Dr. Samuel told her to "just take everything slow." *Id.* at 60. Plaintiff testified that she had good days and bad days, and explained that on good days she experienced pain, but did not suffer from pain "shooting down [her] leg." *Id.* According to Plaintiff, on days when she experienced pain shooting down her leg, she must lay down for the pain to cease. *Id.* Plaintiff stated that she experienced the shooting pain in her leg approximately once a week at most, and that she believed the pain was exacerbated by cold winter weather. *Id.*

-15-

Following Plaintiff testimony, the VE was questioned by the ALJ. Tr. at 61. The ALJ stated that he was using the job described by Plaintiff at the hearing as her past relevant work, and asked the VE to give the job title based on Plaintiff's description of the job. *Id.* at 62. The VE indicated that Plaintiff's past relevant work would be categorized as "general office clerk," which carried a physical demand level of light and presented skills in record keeping, numerical recording, and information giving. *Id.*

Next, the ALJ asked the VE to assume a person of Plaintiff's age, education, and past relevant work, who had the capacity for light work, with the following additional limitations: "standing and walking is limited to four hours of eight, sitting six hours of eight"; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; and avoidance of all exposure to hazards defined as industrial machinery, unprotected heights, and "similar things." Tr. at 62. After providing this description, the ALJ asked the VE whether such a person would be able to perform the work Plaintiff performed in the past. *Id.* at 62-63. The VE explained that the individual described by the ALJ would not be capable of performing Plaintiff's past work per the Dictionary of Occupational Titles ("DOT"), which indicated that work defined as light would generally require more than four hours of walking per day. *Id.* at 63. Continuing, the VE added, "[t]here may be positions per various employers that would satisfy that sit/stand combination." *Id.*

The ALJ then asked the VE if she knew of other work that could be performed by a person with the residual functional capacity ("RFC") previously described. Tr. at 63. The VE stated that such a person could perform work as a Cashier (1,100,000 jobs nationally, 40,000 jobs in the state), Information Clerk (150,000 jobs nationally, 4,000 jobs in the state), and Ticket Seller (1,100,000 jobs nationally, 40,000 jobs in the state). *Id.* Continuing, the ALJ noted that the position of cashier may not allow for the sitting and standing requirements of the ALJ's hypothetical, and reduced the number of jobs available by fifty percent. *Id.* The ALJ stated that in most instances the jobs of ticket seller and an information clerk would meet the demands of the hypothetical provided by the ALJ. *Id.* Next, the ALJ asked the VE whether there would be any skilled or semi-skilled jobs to which Plaintiff's skills would transfer. Tr. at 63-64. The VE provided the jobs of Cost Clerk and

-16-

Checker II, both of which carried physical demand levels of sedentary. *Id.* at 64. The ALJ inquired as to the frequency of the Cost Clerk and Checker II positions. *Id.* The VE stated that he did not have the frequency data at the hearing, but would submit the data to the ALJ. *Id.*

The VE was then examined by Plaintiff's attorney. Tr. at 64. Plaintiff's attorney asked the VE whether it was possible that the jobs provided during her testimony now require the use of computers. *Id.* The VE indicated that it was possible, and that she had tried to find jobs that did not rely on computers since some employers still used paper and pencils. *Id.* at 65. Continuing, the VE stated that she had visited a small medical office that still scheduled appointments in writing, rather than on a computer. *Id.* In response to questioning by Plaintiff's attorney, the VE testified that the position of Cost Clerk would require that Plaintiff learn the particular product and costs to perform the job. *Id.* at 66. The ALJ also testified that record checking aspects of the jobs provided based on the ALJ's hypothetical varied across industries. *Id.* at 66-67. Plaintiff's attorney asked whether these jobs might require adaptation to a different product or manufacturing process, and the VE answered in the affirmative, stating that there was going to be some level of adaptation or adjustment for every new job. *Id.* at 67-68. Following the questioning of the VE and a brief closing statement from Plaintiff's attorney, the ALJ concluded the hearing. *Id.* at 75.

The following day, April 2, 2015, the VE submitted the frequency data for the Cost Clerk and Checker II jobs. Tr. at 463. Along with Cost Clerk (7,000 jobs nationally, 400 jobs in state) and Checker II (800 jobs nationally, 40 jobs in state) frequency data, the VE submitted data for the job of Sorter (50,000 jobs nationally, 2,000 jobs in state). *Id.* at 463. All three jobs offered by the VE carried a physical demand level of sedentary. *Id.*

### III.     SUMMARY OF RELEVANT PORTION OF THE ALJ'S DECISION

After holding the hearing on April 1, 2015, the ALJ issued a decision on May 5, 2015. Tr. at 14. The ALJ determined that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2013, and that Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of December 19, 2009, through her date last insured. *Id.* at 20. Continuing, the ALJ determined that through the date last insured, Plaintiff had the following severe impairments: osteoarthritis and other alleged disorders,

-17-

cataract, discogenic, degenerative disc disease of the cervical spine, and spinal stenosis of the lumbar region. *Id.* The ALJ then determined that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 23.

After considering the record, the ALJ found that, through the date last insured, Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that Plaintiff could: stand and/or walk for four hours out of eight hours and sit for six hours out of eight hours; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. Tr. at 24. The ALJ also determined that Plaintiff must avoid all exposure hazards (*i.e.*, industrial machinery, unprotected heights, and similar things). *Id.*

Following the RFC finding, the ALJ stated that Plaintiff was unable to perform any past relevant work through the date last insured. Tr. at 28. The ALJ found that Plaintiff was sixty-one years of age, and was thus defined as an individual closely approaching retirement age on the date last insured. *Id.* at 29. Continuing, the ALJ stated that Plaintiff had at least a high school education, was able to communicate in English, and that Plaintiff had acquired skills from past relevant work. *Id.* The ALJ determined that, through the date last insured and considering Plaintiff's age, education, work experience, and RFC, Plaintiff had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy. *Id.* In conclusion, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from December 19, 2009, the alleged onset date, through December 31, 2013, the date last insured. *Id.* at 31.

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

-18-

2.      An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.      If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.      If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.      If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.      STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence

supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI.    LAW AND ANALYSIS

### A.    Transferable Skills

Plaintiff asserts that the ALJ's finding that she had skills transferable to a significant number of jobs in the national economy lacked the support of substantial evidence.  ECF Dkt. #11 at 14.  20 C.F.R. § 404.1568(d) states:

(d) *Skills that can be used in other work (transferability) -*

(1) *What we mean by transferable skills.*  We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work.  This depends largely on the similarity of occupationally significant work activities among different jobs.

(2) *How we determine skills that can be transferred to other jobs*.  Transferability is most probable and meaningful among jobs in which -

(i) The same or a lesser degree of skill is required;

(ii) The same or similar tools and machines are used; and

(iii) The same or similar raw materials, products, processes, or services are involved.

(3) *Degrees of transferability*. There are degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs.  A complete similarity of all three factors is not necessary for transferability.  However, when skills are so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining, agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings, we consider that they are not transferable.

(4) *Transferability of skills for persons of advanced age.*  If you are of advanced age (age 55 or older), and you have a severe impairment(s) that limits you to sedentary or light work, we will find that you cannot make an adjustment to other work unless you have skills that you can transfer to

-20-

> other skilled or semiskilled work (or you have recently completed
> education which provides for direct entry into skilled work) that you can
> do despite your impairment(s).  We will decide if you have transferable
> skills as follows...  If you are *closely approaching retirement age* (age 60
> or older) and you have a severe impairment(s) that limit you to no more
> than *light* work, we will find that you have skills that are transferable to
> skilled or semiskilled work only if the light work is so similar to your
> previous work that you would need to make very little, if any, vocational
> adjustment in terms of tools, work processes, work setting, or the industry.

(emphasis in original).  Social Security Rule ("SSR") 82-41(4)(c) adds that individuals who are

age sixty or older, and are limited to light work:

> Cannot be expected to make a vocational adjustment to substantial changes in
> work simply because skilled or semiskilled jobs can be identified which have
> some degree of skill similarity with their [past relevant work].  In order to
> establish transferability of skills for such individuals, the semiskilled or skilled job
> duties of their past must be so closely related to other jobs which they can perform
> that they could be expected to perform these other identified jobs at a high degree
> of proficiency with a minimal amount of job orientation.

Plaintiff asserts that her past relevant work was in the front office of a business that sold

and mounted tires.  ECF Dkt. #11 at 16.  Continuing, Plaintiff indicates that her job duties "were

many and varied," including: contacting customers regarding tires or bills; processing payments

by cash or credit card and sending the payments to the home office on a weekly basis; providing

receipts from the companies that delivered the tires; sending out invoices to customers and

vendors for payment; and using a calculator and a "green machine."[8]  *Id.*  Plaintiff states that she

was not skilled with modern computers and did not know word processing or the Microsoft

programs.  *Id.*  Further, Plaintiff indicates that her work was usually done by hand and that she

did not perform dictation, type, or prepare correspondence.  *Id.*

Next, Plaintiff notes that the VE testified that Plaintiff had the transferable skills of

record keeping, numerical recording, and information giving, and that these skills could be

transferred to two jobs, the first being Cost Clerk, a sedentary position.  ECF Dkt. #11 at 16

(citing Tr. at 64).  Plaintiff correctly states that the VE described this job as one in which the

---

[8]Plaintiff described "green machines" as "the old-fashioned green machine computers where all it
was was a dark screen and the green words on it" [sic].  Tr. at 46.  Further, Plaintiff described her duties, in
part, as "invoicing on that computer, not the internet, just that green machine..."  *Id.*

employee would be required to use a calculator and prepare reports, and that the Cost Clerk position could be found in eighteen industries, including the motor vehicle industry; however, Plaintiff notes that the tire industry is not one of the eighteen industries in which Cost Clerk positions could be found. *Id.* (citing Tr. at 463). Continuing, Plaintiff states that the second job was Checker II, also a sedentary position, and that the VE described this job as involving routine checking duties to ensure the accuracy of recorded data. *Id.* (citing Tr. at 64). Plaintiff indicates that the job of Checker II can be found in five industries, and that the tire industry is not one of the five. *Id.* (citing Tr. at 463). Further, Plaintiff notes that, post-hearing, the VE stated that Plaintiff could transfer her skills to a Sorter job. ECF Dkt. # 11 at 17. Plaintiff indicates that the VE did not describe the tasks or tools for this job, but indicated that Sorter carried a physical demand level of sedentary and that the job could be found in seventeen industries. *Id.* (citing Tr. at 463). Additionally, Plaintiff states that the tire industry was not one of the seventeen industries in which Sorter jobs could be found. *Id.*

Plaintiff states that the ALJ specifically found the VE's testimony reliable and, therefore, concluded that Plaintiff had acquired work skills that were transferable to other occupations that existed in significant numbers in the national economy. ECF Dkt. #11 at 17. Continuing, Plaintiff asserts that it is on this basis the ALJ found that she was not disabled. *Id.* (citing Tr. at 31). Plaintiff claims that the VE's testimony was so faulty and incomplete that it did not rise to the level of substantial evidence to support the ALJ's decision, and, therefore, the ALJ failed to meet her burden at Step Five of the sequential evaluation. *Id.* Next, Plaintiff asserts that the VE was asked three times whether the jobs she cited only included the stated transferable skills, and the VE responded in the affirmative. *Id.* Plaintiff claims that the full DOT description of each job shows that the VE was incorrect. *Id.* Specifically, Plaintiff states that the Cost Clerk job required knowledge of the specific employer's business and product, and involved writing reports beyond mere numbers. *Id.* (citing ECF Dkt. #11-1 at 1-2). Plaintiff asserts that the Checker II job required specific knowledge of the employer's business and products, as well as the ability to type letters, reports, and memorandums. *Id.* Further, Plaintiff states that the Sorter job included duties and tasks that could change daily, required a knowledge of the employer's

-22-

business and services or products, and required the ability to type letters, reports, and memorandums. *Id.* at 17-18. According to Plaintiff, although there may have been some degree of skill similarity between the proffered jobs and Plaintiff's past relevant work, there was no evidence that Plaintiff could be expected to perform the identified jobs with a high degree of proficiency with little, if any, training. *Id.* at 18.

Plaintiff also asserts that the VE failed to fully address the amount of adjustment required to successfully perform the tasks required for the jobs of Cost Clerk, Checker II, and Sorter. ECF Dkt. #11 at 18. Continuing, Plaintiff states that the VE attempted to say that since Plaintiff's past relevant work was "clerical" she could perform any clerical position in a variety of settings. *Id.* Plaintiff takes issue with the VE's statement, asserting that the VE also testified that Plaintiff would be required to learn the particular products and costs of an employer to perform the work. *Id.* Additionally, Plaintiff avers that the VE indicated that Plaintiff would be required to maintain records, but did not provide a specific type of record, instead stating that it depended on the industry. *Id.* Plaintiff also indicates that the VE stated that "there would not be a huge learning curve" for Plaintiff to adjust to one of the jobs provided, and argues that there is a difference between a learning curve that was not huge and the very little, if any, vocational adjustment, as required by 20 C.F.R. § 404.1568(d)(4). *Id.* Further, Plaintiff claims that the VE's testimony fails to meet the requirements of SSR 82-41 because Plaintiff could not be expected to perform the jobs provided by the VE at a high degree of proficiency with a minimal amount of job orientation. *Id.* at 19.

Next, Plaintiff asserts that the ALJ failed to prove that Plaintiff's skills could be readily transferable to a significant range of semi-skilled or skilled work at the light level. ECF Dkt. #11 at 19. Plaintiff states that of the forty industries that the VE said offered the generic positions of Cost Clerks, Checkers, and Sorters, "only one industry was in the automotive industry and even that was not in the tire industry in which [Plaintiff] worked." *Id.* Based on the foregoing argument, Plaintiff avers that the ALJ failed to meet her burden of proof at Step Five of the sequential evaluation, and requests that the Court remand Plaintiff's case for payment of benefits. *Id.* at 19-20.

Defendant begins by providing the DOT description for the Cost Clerk position, which reads as follows:

> Compiles production or sales cost reports on unit or total basis for department or working unit: Calculates individual items, such as labor, material, and time costs, relationship of sales or revenues to cost, and overhead expenditures, using calculating machine. Examines records, such as time and production sheets, payrolls, operations charts and schedules, to obtain data for calculations.  Prepares reports showing total costs, selling prices, or rate profits.  May be designed according to work performed as Cost-examining Clerk (Utilities); Operating-Cost Clerk (clerical).

ECF Dkt. #12 at 16 (citing DICOT, 216.382-034 Cost Clerk, 1991 WL 671925).  Defendant asserts that a review of Plaintiff's description of her past relevant work reveals significant similarities between the two positions.  *Id.*  First, Defendant notes that Plaintiff testified that her duties at her past work included: invoicing on a "green machine"; helping customers pay their bills; handling customer transactions; preparing invoices; sometimes handling collections; and handling dispute with customers if the dispute involved invoicing.  *Id.* (citing Tr. at 47, 49).

Continuing, Defendant indicates that in Plaintiff's September 2012 affidavit, Plaintiff stated that her duties involved "a lot of typing and handwriting."  *Id.* (citing Tr. at 319).  Defendant further asserts that Plaintiff stated in her September 2012 affidavit that her duties included: answering the phones and handling customer complaints or taking tire orders; greeting customers and taking their orders; printing work forms; processing payment by taking cash or credit cards for the purchase of tires; handwriting delivery receipts for each tire company; using an adding machine to balance various accounts; banking and counting petty cash; filing paperwork and collecting time cards to send to headquarters for payroll; helping injured employees fill out Worker's Compensation paperwork and speaking with Worker's Compensation about any concerns; and mailing all credit card transactions to the credit card companies and balancing all receipts with the statements on a weekly basis.  *Id.* (citing Tr. at 319-20).

Next, Defendant states that Plaintiff's contention that she could not perform the work described in the Checker II position because it required the ability to type letters, reports, and memorandums fails because Plaintiff stated in her September 2012 affidavit that she typed often.  *Id.* (citing Tr. at 319).  Defendant also avers that Plaintiff's contention that the Checker II job

-24-

required specific knowledge of the employer's business is not evident fro the DOT description.

*Id.*  The DOT description for Checker II reads as follows:

> Perform routine checking duties to ensure accuracy of recorded data: Compares information or figures on one record against same data on other records.  Corrects or records omissions, errors, or inconsistencies found.  Is not characteristically engaged in making computations [AUDIT CLERK (clerical); CALCULATING-MACHINE OPERATOR (clerical)] but does not use arithmetic.  Does not check incoming or outgoing shipments, or record or keep tallies [RECEIVING CHECKER (clerical); SHIPPING CHECKER (clerical)].  May be designated according to type of clerical work checked as Billing Checker (clerical); Entry Examiner (clerical); Installment-Account Checker (clerical).  May be designated: Asset-Card (clerical); Coupon-Manifest Clerk (clerical); Outlaw-Loan-Record Clerk (clerical); Price Checker (clerical); Printed-Forms Proofreader (clerical); Typing Checker (clerical).

*Id.* (citing DICOT 209.687-010 Checker II, 1991 WL 671809).  Defendant also asserts that, as with the Cost Clerk position, the description for Checker II does not mention any requirement that the employee have specific knowledge about the employer's business.  *Id.* at 18.

Continuing, Defendant cites the DOT for Sorter, which reads:

> Sorts data, such as forms, correspondence, checks, receipts, bills, and sales tickets, into specified sequence or grouping, such as by address, code, quantity, and class, for such purposes as filing, mailing, copying, or preparing records.  May be designated according to work performed as Bill Sorter (clerical); Sales-Slip Sorter (clerical).

ECF Dkt. #12 at 18 (citing DICOT 209.687-022 Sorter, 1991 WL 671812).  Defendant indicates that there is no mention that the job of Sorter required knowledge of the employer' business and services or products.  *Id.*

After addressing the DOT descriptions for the jobs of Cost Clerk, Checker II, and Sorter, Defendant raises *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847(6th Cir. 2010).  In *Kyle*, the plaintiff, who had previously worked in the laminates industry, argued that the ALJ erred in finding there was substantial evidence of jobs to which [he] could transfer skills.  *Id.* at 856.  The Sixth Circuit held:

> The fact that the DOT codes revealed [the jobs offered by the VE] were jobs dissimilar to the laminates industry is not an indication [the plaintiff's] skills could not transfer to them.  Most importantly, regardless of the tools of materials in [plaintiff's] past industry, the VE repeatedly emphasized the supervision skill as the transferable skill stating "[the plaintiff has] obviously demonstrated the ability to do the production supervisor work..." and "obviously he has the ability to relate

> to people... [H]e was beating production quotas, so he obviously knows how to do it." [The plaintiff] indicated he was in charge of hiring and firing over 40 people for more than ten years. The VE testified that, of his skills, the supervisory skills were the most important. Therefore, this Court finds the ALJ had substantial evidence on which to base her opinion that [the plaintiff] had transferable skills and will not disturb the ALJ's findings.
>
> The Court agrees that the VE's testimony may suggest [the plaintiff's] supervisory skills would be useful only if transferred to an industry in which he had experience. However, this Court finds the ALJ relied on the VE's ultimate opinion the [the plaintiff's] skills were transferable, and this testimony served as substantial evidence upon which it was proper for the ALJ to rely. Further, even if this Court had come to a different factual conclusion, it would not disturb the findings of the ALJ which are based on substantial evidence.

*Id.* at 856-57 (internal citations omitted). Defendant asserts that, based on the Sixth Circuit's decision in *Kyle*, the ALJ's finding that Plaintiff had transferable work skills is supported by substantial evidence. ECF Dkt. #12 at 19. As a final note, Defendant argues that the facts in the present case are even more compelling than the facts in *Kyle* because the Cost Clerk job was present in the motor vehicle and parts industry, an industry in which Plaintiff has fifteen years of experience. *Id.*

Plaintiff contends that the instant case presents "several glaring differences" from *Kyle*, namely: the plaintiff in *Kyle* was forty-eight years old and considered a "younger individual"; the plaintiff in *Kyle* possessed supervisory skills; and the *Kyle* court did not address the issue of "very little, if any" vocational adjustment. ECF Dkt. #14 at 5.

After considering the arguments presented by the parties, the undersigned finds that substantial evidence supported the ALJ's finding that Plaintiff had transferable skills. Plaintiff's argument that the ALJ erred by relying on VE's testimony, which was alleged to be so deficient that it did not rise to the level of substantial evidence and thus failed to meet Defendant's burden at Step Five of the sequential evaluation, is without merit.

As an initial matter, Plaintiff claims that the VE testified that the Cost Clerk and Checker II jobs required only the transferable skills stated at the hearing, despite the DOT description revealing that additional skills would be required for these two positions. ECF Dkt. #11 at 17

(citing Tr. at 64, 68).[9] Plaintiff asserts that her attorney asked the VE three times whether the jobs cited only included the "transferable skills" and no additional skills, and that the VE replied in the affirmative despite the DOT containing additional skills that would be required for the jobs.[10] *Id.*  Plaintiff asks that the Court find that the ALJ erred, among other reasons, because she relied on the testimony of the VE, who testified that Plaintiff had three transferable skills despite the DOT description of Cost Clerk and Checker II listing additional requirements.

While the Plaintiff is correct that the VE stated that the jobs of Cost Clerk and Checker II did not require additional skills, it is not clear whether the VE was considering only the three "transferable skills" provided, or Plaintiff's practical skills based on her prior experience.  *See* Tr.at 62, 64-65, 68.  In any event, the VE's testimony included citations to the DOT for each position offered.  *Id.* at 64.  The ALJ was made aware that the VE was relying on the descriptions of the jobs contained in the DOT, and that the VE's testimony was based upon such descriptions.  Plaintiff cites to no rule stating that the VE is required to read the entirety of the DOT job description at the hearing so as to be certain that every possible skill associated with the position is read into the record.  Moreover, the ALJ, cited to the DOT when discussing the Cost Clerk and Checker II jobs, as well as the Sorter job, when addressing the VE's testimony in her decision.  Plaintiff's claim that the jobs offered by the VE included skills that were not "transferable skills" ignores the fact that the entirety of the DOT job descriptions were presented to the ALJ prior to her decision.  The ALJ was aware of the skills associated with all three jobs offered by the VE when she chose to accept the VE's testimony.

Plaintiff describes her past relevant work duties as including: invoicing on a "green machine"; helping customers pay their bills; handling customer transactions; preparing invoices; sometimes handling collections; handling dispute with customers if the dispute involved

---

[9]The citation in Plaintiff's brief on the merits reads, "(TR.58, 58 & 62)."  *See* ECF Dkt. #11 at 17.  The citation in the text of this Report & Recommendation cites to the pages as numbered in the CM/ECF system.  *See* n. 2, *supra*.  All citations by Plaintiff and Defendant have been revised to reflect the pages as numbered in the CM/ECF system.

[10]The "transferable skills" provided by the VE were record keeping, numerical recording, and information giving.  *See* Tr. at 62.

invoicing; hiring and firing temporary employees based on the workload; "a lot of typing and handwriting"; answering the phones and handling customer complaints or taking tire orders; greeting customers and taking their orders; printing work forms, processing payment by taking cash or credit cards for the purchase of tires; handwriting delivery receipts for each tire company; using an adding machine to balance various accounts; banking and counting petty cash; filing paperwork and collecting time cards to send to headquarters for payroll; helping injured employees fill out Worker's Compensation paperwork and speaking with Worker's Compensation about any concerns; and mailing all credit card transactions to the credit card companies and balancing all receipts with the statements on a weekly basis.  Tr. at 47, 49, 319-20.

The DOT description for Cost Clerk presents duties that closely resemble Plaintiff's past relevant work duties.  *See* ECF Dkt. #11-1.  Both Plaintiff's past relevant work and the Cost Clerk position involve tracking business revenue and expenditures using a calculating machine ("green machine," as stated by Plaintiff).  Plaintiff argues that her past relevant work did not involve writing "reports beyond mere numbers," and thus she would be unable to perform work as a Cost Clerk since she would be required to prepare reports.  ECF Dkt. #11 at 17.  However, despite Plaintiff's claim that her past relevant work does not indicate that she could prepare reports, Plaintiff stated in her September 2012 affidavit that "[her] duties were varied and involved a lot of typing and writing" and "[she] would type all delivery receipts to each individual tire company."  Tr. at 319.  From Plaintiff's own affidavit, it is evident that she knew how to type and would be capable of typing a report.  As far as Plaintiff's ability to organize and compile a report, the reporting requirements for Cost Clerk consists of preparing reports "showing total cost, selling prices, or rates profits."  DICOT 216.382-034, 1991 WL 671925 Cost Clerk.  Plaintiff's past relevant work demonstrates that she would be capable of preparing reports of this nature as she has experience invoicing, processing payments, preparing receipts, and balancing all receipts with the related statements.  Insofar as Plaintiff claims that she could not prepare "reports beyond mere numbers," the DOT description for Cost Clerk indicates that the position requires the ability to read at an eighth-grade level.  ECF Dkt. #11-1 at 2.  As

Plaintiff has at least a high school education, there is no reason to believe that she could not prepare a report using proper format, punctuation, spelling, and grammar, or any other requirement in the DOT description.

As for the Checker II position, Plaintiff claims that she lacks the ability to meet the reporting requirements of the job. ECF Dkt. #11-1 at 17. The record shows that Plaintiff is capable of typing and maintaining records, as well as running an office and managing, to some degree, the hiring and firing of temporary employees. *See* Tr. at 319-20. The reporting requirements related to the Checker II position include typing and posting names of crew and current assignments and preparing register and scheduling vacations, and "can require the ability to type letters, reports, and memorandums." ECT Dkt. #11-2 at 2. Plaintiff's past relevant work duties demonstrate that she would be capable of the duties associated with Checker II, as Plaintiff stated that she typed often and prepared several types of business documents regularly. *See* Tr. at 47, 49, 319-20.

Plaintiff argues that the duties associated with the Sorter position could change daily, and, like the Checker II position, she would be unable to meet the reporting requirements since they involve type letters, reports, and memorandums. ECF Dkt. #11 at 17-18. Despite her contention, Plaintiff stated that her past relevant work duties included "a lot of typing." Tr. at 319. As for Plaintiff's claim that she would be unable to perform work as a Sorter because the duties could change daily, Plaintiff's past relevant work included numerous duties included invoicing, handling customer transactions, collections, handling receipts, balancing accounts, handling the banking and petty cash, and dealing, to some degree, with Worker's Compensation claims. Tr. at 47, 49, 319-20. From Plaintiff's past relevant work, it is evident that she can handle a number of varying duties.

In addition to the above contentions, Plaintiff claims that she would be required to have: knowledge of the employer's business and products for the Cost Clerk position; specific knowledge of the employer's business and products for the Checker II position; and knowledge of the employer's business and services or products for the Sorter position. ECF Dkt. #11 at 17-18. Plaintiff provides no elaboration on these claims, and her general citations to the DOT

-29-

descriptions fail to explain how any of the positions require skills or knowledge that Plaintiff did not already possess or could not easily learn.

As for Plaintiff's claim that these three positions do not meet the requirements of 20 C.F.R. § 404.1568(d) (because they do not constitute "very little, if any, vocational adjustment) and SSR 82-41 (because Plaintiff could not be "expected to perform these other identified jobs at a high degree of proficiency with a minimal amount of job orientation"), the undersigned finds these arguments unconvincing.  Plaintiff's past relevant work was essentially running an office.  Plaintiff's duties were, in her own words, "many and varied," and even involved management of temporary employees.  Tr. at 319-20.  Despite Plaintiff's contention that she cannot type, Plaintiff states several times in her September 2012 affidavit that she performed typing duties as part of her past relevant work, even stating that her duties involved "a lot of typing."[11]  *Id.*  The three positions presented by the VE present clerical work that does not rise to the level of Plaintiff's past relevant work.  *See* Tr. at 47, 49, 319-20; ECF Dkt. #11-1, #11-2, #11-3.  In fact, Plaintiff's past relevant work, based on her own testimony and affidavit, appears to have encompassed some, if not all, of the aspects of all three jobs presented by the VE.  *See id.*  Accordingly, Plaintiff would be able to use skills from her past relevant work to transition into any of the three positions provided by the VE with little, if any, vocational adjustment and could be expected to perform these jobs at a high degree of proficiency with a minimal amount of job orientation.

Finally, in *Kyle*, the Sixth Circuit found that the ALJ relied on the VE's ultimate opinion that the plaintiff's skills were transferable, and that the VE's testimony served as substantial evidence upon which it was proper for the ALJ to rely.  *Kyle*, 609 F.3d at 857.  Immediately after making this finding, the Sixth Circuit stated, "[f]urther, even if this Court had come to a different factual conclusion, it would not disturb the findings of the ALJ which are based on substantial evidence."  *Id.* (citing *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983);

---

[11]Additionally, Plaintiff's activities of daily living included using a computer to surf the internet one day a week.  *See* Tr. at 667.  This activity of daily living runs contrary to Plaintiff's claim that she does not know how to operate modern computers.

-30-

*Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604-605 (6th Cir. 2009)*; Germany-Johnson v. Comm's of Soc. Sec.*, 313 Fed.Appx. 771, 774-75 (6th Cir. 2008)). The undersigned recognizes that Plaintiff differs from the plaintiff in *Kyle* insofar as he was forty-eight years old and considered a "younger individual" who possessed supervisory skills, and that the *Kyle* court did not address the issue of "very little, if any" vocational adjustment. However, the holding in *Kyle* is still applicable as the ALJ relied on the VE's ultimate opinion that Plaintiff's skills were transferable and this testimony served as substantial evidence upon which it was proper for the ALJ to rely. *Id.* Therefore, the ALJ's findings should not be disturbed.

For the forgoing reasons, the undersigned recommends that the Court find that substantial evidence supported the ALJ's finding that Plaintiff had transferable skills and affirm the decision of the ALJ.

### B. Treating Physician Rule

Plaintiff also asserts that the ALJ failed to comply with the treating physician rule in evaluating the opinion of Dr. Samuel, the treating specialist. Under the treating physician rule, an ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those

-31-

reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

Dr. Samuel, the treating specialist, opined that Plaintiff: could stand or walk for thirty minutes at a time for a total of four hours in an eight-hour workday; could sit for up to two hours at a time for a total of six hours in an eight-hour workday; required a job that had an at-will sit/stand option, and that she did not require a cane and did not need to take unscheduled breaks during an eight-hour workday; could frequently lift less than ten pounds; could occasionally lift ten pounds; could rarely lift twenty pounds; could never lift fifty pounds; could frequently climb stairs; could occasionally twist; could rarely stoop or crouch/squat; could never bend; and could frequently look down, turn her head right or left, look up, and hold her head in a static position. Tr. at 912-13.

Plaintiff claims that the ALJ ignored the first prong of the treating physician rule in violation of *Gayheart*, 710 F.3d 365, 376-77 (6th Cir. 2013), and simply stated that Dr. Samuel's overall opinion was unsupported by the record as a whole.  ECF Dkt. #11 at 21.  Continuing, Plaintiff claims that the only evidence the ALJ referenced in support of the above finding was Dr. Samuel's medical records, and that a review of the record as a whole shows that Dr. Samuel's opinion was not inconsistent with other medical evidence.  *Id.* at 21-22.  In support of her position, Plaintiff states that the *Gayheart* court indicated that conflicting substantial evidence must consist of more than the medical opinions of non-treating and non-examining doctors.  *Id.* at 22 (citing *Gayheart*, 710 F.3d at 377).

The test presented in *Gayheart* states that treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the case record.  *Gayheart*, 710 F.3d at 376.  Plaintiff claims that the ALJ ignored the first prong of the test, however,  Plaintiff is incorrect.  The first prong of the *Gayheart* test requires that the treating-source opinion be well-supported by medically acceptable clinical and laboratory diagnostic techniques.  When discussing Dr. Samuel's opinion in her decision, the ALJ provided citations to clinical and laboratory diagnostic techniques that did not support Dr. Samuel's opinion.

The ALJ indicated that, despite Plaintiff's allegations of radiating pain during office visits on October 4, 2012, June 18, 2013, August 5, 2013, and December 19, 2013, her straight leg raise tests were negative.  Tr. at 28.  Continuing, the ALJ stated that although medical professionals found evidence of tenderness in the lumbar spine, antalgic gait, and reduced range of motion, they also consistently found no evidence of weakness, no pain in the cervical spine, and no neurological deficits.  Tr. at 28 (citing Tr. at 932, 1027, 1041, 1053-54).  The ALJ also indicated that, while the record contained no evidence of surgical intervention or a change in treatment, during a visit on February 21, 2014, Himanshu Dubey, M.D., continued to describe Plaintiff as alert and in no distress, and reported that she ambulated and transferred "well."  *Id.* (citing Tr. at 1142).  Next, the ALJ stated that during office visits for treatment of back pain,

-33-

medical professionals consistently found Plaintiff well appearing, alert, and oriented to all spheres with appropriate mood and affect. *Id.* (citing Tr. at 932, 1027, 1041, 1053). These medically acceptable clinical and laboratory diagnostic techniques undermined the credibility of the opinion issued by Dr. Samuel as they provide medical evidence suggesting that Plaintiff was not as disabled as Dr. Samuel opined. Accordingly, the ALJ cited medically acceptable clinical and laboratory diagnostic techniques that were inconsistent with Dr. Samuel's opinion and did not ignore the first prong of the test presented in *Gayheart*.

Next, Plaintiff appears to argue that the ALJ improperly analyzed the second prong of the test presented in *Gayheart* by asserting that the opinions of the state agency physicians did not conflict with Dr. Samuel's opinion.[12] ECF Dkt. #11 at 22. The state agency physicians opined that Plaintiff could: stand and/or walk, with normal breaks, for about six hours in an eight-hour workday; sit, with normal breaks, for about six hours in an eight-hour workday; lift twenty pounds occasionally; and lift ten pounds frequently.[13] Tr. at 126-35, 136-49. Dr. Samuel opined that Plaintiff: could stand or walk for thirty minutes at a time for a total of four hours in an eight-hour workday; could sit for up to two hours at a time for a total of six hours in an eight-hour workday; required a job that had an at-will sit/stand option, and that she did not require a cane and did not need to take unscheduled breaks during an eight-hour workday; could frequently lift less than ten pounds; could occasionally lift ten pounds; could rarely lift twenty pounds; could never lift fifty pounds; could frequently climb stairs; could occasionally twist; could rarely stoop or crouch/squat; could never bend; and could frequently look down, turn her head right or left, look up, and hold her head in a static position. Tr. at 912-13.

Despite Plaintiff's assertion that the opinions of Dr. Samuel and the state agency physician are not conflicting, Dr. Samuel's opinion contains restrictions above and beyond the

---

[12]The test presented in *Gayheart* states that treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the case record. *Gayheart*, 710 F.3d at 376.

[13]Plaintiff agrees that this statement accurately reflects the opinion of state agency physicians Dr. McKee and Dr. Lehv. *See* ECF Dkt. #11 at 10.

restrictions contained in the opinions of the state agency physicians.  Plaintiff attempts to explain away the additional restrictions in Dr. Samuel's opinion by stating, "[the state agency reviewing physicians'] opinions did not conflict with Dr. Samuel's opinion as they did not address all the issues [Dr. Samuel's] did."  ECF Dkt. #11 at 22.  Plaintiff's explanation is unconvincing.  For example, Dr. Samuel's opinion includes additional standing and sitting restrictions, limiting Plaintiff to thirty minutes of either activity at a time.  Also, Dr. Samuel's imposed more restrictive lifting restrictions.  Further, Plaintiff does not adequately explain, or cite to the record, how or why the state agency physicians did not fully assess Plaintiff. Accordingly, there is at least some conflict between the opinions of the state agency physicians and Dr. Samuel.

As for other substantial evidence in the record that is inconsistent with Dr. Samuel's opinion (second prong of the test presented in *Gayheart*), Defendant asserts that Plaintiff's activities of daily living are inconsistent with Dr. Samuel's opinion.  ECF Dkt. #12 at 22. Defendant states that in September 2011 Plaintiff indicated she: was independent, cared for herself, and performed all her own housework; took care of her hygiene; shampooed her hair three times per week; vacuumed and swept the floors once a week; mopped once a month; cooked dinner four times per week; used the computer and surfed the internet once a week; took her grandchildren to school; checked homework; served dinner; socialized with other relatives three times per month; and socialized with associates twice a month.  *Id.* (citing Tr. at 630, 667). Defendant asserts that Plaintiff testified she was able to cook in July 2012.[14]  *Id.* (citing Tr. at 54).  Additionally, Defendant states that in June 2012, Plaintiff reported going to the pool with her granddaughter.  *Id.* (citing Tr. at 757).  Plaintiff does not address her activities of daily living, or the ALJ's treatment of the activities in her brief on the merits or reply brief.  *See* ECF Dkt. #11, #14.  Notably, Plaintiff's activities of daily living included using a computer to surf

---

[14]Defendant actually states that Plaintiff testified she was able to cook in "July 2012 or 2013."  ECF Dkt. #12 at 22.  After a review of the cited portion of the record, it appears that Plaintiff intended to say July 2012.  Tr. at 54.

the internet once a week.  *See* Tr. at 667.  This activity belies Plaintiff's claim that she does not know how to operate modern computers.

After the brief argument regarding the second prong of the test presented in *Gayheart*, Plaintiff returns to the first prong, presenting several pieces of medical evidence she believes weigh in the favor of a finding of disability.  ECF Dkt. #11 at 23.  Plaintiff does not explain how this medical evidence demonstrates that the ALJ did not provide good reasons for affording Dr. Samuel's opinion less than controlling weight.  *See* SSR96-2p.  For the reasons stated above, the ALJ relied on substantial evidence when assessing Dr. Samuel's opinion and affording it less than controlling weight.

Finally, Plaintiff claims that the ALJ did not specify what portion of Dr. Samuel's opinion she afforded "some weight."  ECF Dkt. #11 at 24.  Plaintiff is incorrect.  The ALJ stated, "[the] undersigned gives some weight to Dr. Samuel's opinion to the extent the record shows a history of back pain with reduced range of motion and impaired gait."  Tr. at 28.  The portions of Dr. Samuel's opinion that were afforded some weight were made clear in the ALJ's decision.

For the reasons stated above, the undersigned recommends that the Court find that the ALJ's evaluation of Dr. Samuel's opinion was supported by substantial evidence and did not violate the treating physician rule, and affirm the decision of the ALJ.

## VII.   CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.


Date: January 23, 2017                          */s/George J. Limbert*
                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's

recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).